LIU, J., Concurring.
Defendant, a black man, was charged with raping and murdering a young white woman in Kern County. Defendant’s first trial resulted in a hung jury that divided 11 to one in favor of guilt. The holdout juror was the lone African American on the jury. Before retrial, the defense moved for a change of venue, presenting survey results showing that black residents of the county were significantly less likely than white or other residents to prejudge defendant as guilty or to prejudge that his crime merited the death penalty if he was found guilty. The motion was denied.
In selecting the second jury, the prosecutor used peremptory challenges to excuse the first two black prospective jurors seated in the jury box. Defendant objected, claiming that the prosecutor struck these jurors on the basis of race. The trial court concluded that defendant had not made a prima facie showing of discrimination and that the prosecutor was therefore not required to explain these strikes. The trial court nevertheless invited the prosecutor to state his reasons for the strikes, but the prosecutor declined. Ultimately, the jury that convicted defendant and sentenced him to death consisted of 10 white jurors, one Hispanic juror, and one black juror.
*864 Today’s opinion holds that defendant failed to make a prima facie showing of a Batson violation. (Batson v. Kentucky (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (Batson).) It concludes that the circumstances of this case do not “raise an inference that the prosecutor excluded a prospective juror based on race.” (Maj. opn., ante, at p. 834.) This questionable result is compelled by our precedent, and for that reason, I join the court in rejecting defendant’s Batson claim.
I write separately, however, to observe that our Batson jurisprudence on what is required to show a prima facie case of discrimination, including our decision in the present case, appears noticeably out of step with principles set forth by the United States Supreme Court in two crucial respects. First, by scouring the record for nonobvious reasons that might explain the peremptory strike of a minority juror, and by relying on such reasons to negate the inference of discrimination otherwise arising from the circumstances, this court has improperly elevated the standard for establishing a prima facie case beyond the showing that the high court has deemed sufficient to trigger a , prosecutor’s obligation to state the actual reasons for the strike. Second, while regularly invoking nonobvious reasons that a prosecutor might have given for striking a minority prospective juror, this court has erroneously prohibited the use of comparative juror analysis to test whether a hypothesized reason was likely the actual reason for a particular strike. Such a prohibition, which today’s opinion restates and does not disavow, precludes reviewing courts from considering all relevant circumstances bearing on a claim of discrimination.
Both infirmities threaten Batson's vitality by improperly restricting a party’s ability to probe peremptory challenges that may be unconstitutionally discriminatory. As the high court has emphasized, “racial discrimination in the selection of jurors ‘casts doubt on the integrity of the judicial process,’ [citation], and places the fairness of a criminal proceeding in doubt.” (Powers v. Ohio (1991) 499 U.S. 400, 411 [113 L.Ed.2d 411, 111 S.Ct. 1364] (Powers).) Such discrimination harms not only the accused. “A venireperson excluded from jury service because of race suffers a profound personal humiliation . . .” (id. at p. 413) and loses “a significant opportunity to participate in civic life” (id. at p. 409). Further, “the entire community” has a strong interest in the fairness of our courts. (Batson, supra, 476 U.S. at p. 87.) Whereas the Batson inquiry seeks to ensure that a prosecutor’s actual reasons for a peremptory strike are not discriminatory, this court’s unduly narrow understanding of what constitutes a prima facie case of discrimination serves to excuse trial courts from asking, and to excuse prosecutors from stating, the actual reasons for striking a minority juror. A jurisprudence of “don’t ask, don’t tell” does not properly safeguard “the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.” (Id. *865 at pp. 85-86.) Nor does it promote “public confidence in the fairness of our system of justice.” (Id. at p. 87.)
The discussion that follows dovetails with concerns I have expressed about our Batson jurisprudence in another case filed today and in a third case decided earlier this term. (See People v. Mai (2013) 57 Cal.4th 986, 1060 (conc. opn. of Liu, J.) (Mai); People v. Williams (2013) 56 Cal.4th 630, 699 [156 Cal.Rptr.3d 214, 299 P.3d 1185] (dis. opn. of Liu, J.) (Williams).) A generation ago, Batson observed: “The reality of practice, amply reflected in many state- and federal-court opinions, shows that the [peremptory] challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice. In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rale of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.” (Batson, supra, 476 U.S. at p. 99, fn. omitted.) The high court has echoed, extended, and amplified these concerns many times since. (See Powers, supra, 499 U.S. 400; Edmonson v. Leesville Concrete Co. (1991) 500 U.S. 614 [114 L.Ed.2d 660, 111 S.Ct. 2077]; Georgia v. McCollum (1992) 505 U.S. 42 [120 L.Ed.2d 33, 112 S.Ct. 2348]; J. E. B. v. Alabama ex rel. T. B. (1994) 511 U.S. 127 [128 L.Ed.2d 89, 114 S.Ct. 1419]; Miller-El v. Cockrell (2003) 537 U.S. 322 [154 L.Ed.2d 931, 123 S.Ct. 1029]; Johnson v. California (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410]; Miller-El v. Dretke (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (Miller-El); Snyder v. Louisiana (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (Snyder).)
Yet consider this fact: In adjudicating Batson claims in more than 100 cases over the past two decades, this court has found unlawful discrimination in jury selection only once—and that was a case more than 12 years ago in which the prosecutor stmek all five Hispanic members of the venire and through his own words “revealed an acute sensitivity to the presence of Hispanics on the jury panel and an evident belief that Hispanics would not be favorable jurors for the prosecution.” (People v. Silva (2001) 25 Cal.4th 345, 375 [106 Cal.Rptr.2d 93, 21 P.3d 769] (Silva).) Like my colleagues, I am confident that California’s prosecutors and trial judges take seriously their responsibility to avert racial discrimination in jury selection. But one need not question the overall excellence and integrity of our prosecutors and trial courts in order to pause and wonder, in light of the remarkable uniformity of this court’s Batson decisions over the past 20 years, whether we have maintained the proper level of vigilance. Today, as when Batson was decided, it is a troubling reality, rooted in history and social context, that our black citizens are generally more skeptical about the fairness of our criminal justice system than other citizens. Yet it is precisely to ensure public confidence in *866 our courts and their verdicts that Batson “forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State’s case against a black defendant.” (Batson, supra, 476 U.S. at p. 89.) I have serious doubts as to whether our jurisprudence has held true to Batson's mandate.
I.
The Fourteenth Amendment to the United States Constitution prohibits a party from using peremptory challenges to strike a prospective juror because of his or her race. (See Batson, supra, 476 U.S. at p. 89.) In Batson, the high court set forth a three-stage analysis to determine whether the prosecution has violated this mandate. First, a defendant must establish a prima facie case of discrimination “by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.” (Id. at p. 94.) Second, once the defendant “makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging” the prospective jurors in question. (Id. at p. 97.) Finally, at the third stage, the court must consider the totality of relevant circumstances to determine whether it is more likely than not that the peremptory challenges were based on impermissible discrimination. (Id. at p. 98.)
The present case involves Batson’s first-stage requirement that a defendant make a prima facie showing of discrimination. Batson elucidated this requirement against the backdrop of Swain v. Alabama (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824], which a number of courts had interpreted to hold that a defendant could establish a prima facie case only with “proof of repeated striking of blacks over a number of cases.” (Batson, supra, 476 U.S. at p. 92.) In Batson, the high court observed that this interpretation had “placed on defendants a crippling burden of proof’ (ibid.), leaving “prosecutors’ peremptory challenges . . . largely immune from constitutional scrutiny” (id. at pp. 92-93). Batson therefore “rejected] this evidentiary formulation” and instead established a less stringent standard for making a prima facie case. (Id. at p. 93.)
According to Batson, “the defendant first must show that he is a member of a cognizable racial group, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant’s race.” (Batson, supra, 476 U.S. at p. 96.) Although the high court later held that a defendant need not share the race of the challenged juror in order to' assert a Batson claim (see Powers, supra, 499 U.S. at p. 402), “[r]acial identity between the defendant and the excused person . . . may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred” (id. at p. 416). “Second, *867 the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits ‘those to discriminate who are of a mind to discriminate.’ ” (Batson, at p. 96.) Finally, the defendant may point to “any other relevant circumstances” suggestive of discrimination, including “a ‘pattern’ of strikes against black jurors” and “the prosecutor’s questions and statements during voir dire examination and in exercising his challenges.” (Id. at pp. 96-97.) A defendant meets the burden of establishing a prima facie case if this “combination of factors” raises an “inference of purposeful discrimination.” (Id. at p. 96.)
Prior to Batson, this court in People v. Wheeler (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (Wheeler), interpreting the California Constitution, adopted a similar three-stage framework for analyzing claims of racial discrimination in jury selection. Wheeler’s standard for establishing a prima facie case of discrimination required a defendant to show a “strong likelihood” of discrimination. (Wheeler, at p. 280.) Some years later, this court in People v. Johnson (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270] held that “[u]nder both Wheeler and Batson, to state a prima facie case, the objector must show that it is more likely than not the other party’s peremptory challenges, if unexplained, were based on impermissible group bias.” (Id. at p. 1306, italics added.) According to People v. Johnson, “when [the high court] refers to the objector establishing ‘an inference of discriminatory purpose’ (Batson, supra, 476 U.S. at p. 94), the high court means establishing a legally mandatory rebuttable presumption, and not merely presenting enough evidence to permit the inference.” (Id. at p. 1315.)
In Johnson v. California, supra, 545 U.S. 162, the United States Supreme Court reversed our decision in People v. Johnson and held that “California’s ‘more likely than not’ standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case” at Batson’s first stage. (Id. at p. 168.) The high court explained: “[W]e assumed in Batson that the trial judge would have the benefit of all relevant circumstances, including the prosecutor’s explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson’s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.” (Id. at p. 170.) The high court further observed that setting a low threshold for establishing a prima facie case is fully consistent with Batson’s purposes: “The Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels *868 against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.” (Id. at p. 172.)
The high court then applied the Batson first-stage inquiry to the facts before it. The defendant, who was black, had been convicted of murdering his white girlfriend’s 19-month-old child. (Johnson v. California, supra, 545 U.S. at p. 164.) The prosecution had used three peremptory challenges to strike all three of the black prospective jurors on the panel. When the defense objected, the trial judge did not seek an explanation from the prosecutor. Instead, the trial judge “explained that her own examination of .the record had convinced her that the prosecutor’s strikes could be justified by race-neutral reasons. Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires.” (Id. at p. 165.) On appeal, this court affirmed the trial court’s ruling but “acknowledged that the case involved the ‘highly relevant’ circumstance that a black defendant was ‘charged with killing “his White girlfriend’s child,” ’ and that ‘it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.’ [Citation.]” (Id. at p. 167.)
The high court, analyzing the issue in a brief paragraph, said that “the inference of discrimination was sufficient to invoke a comment by the trial judge ‘that “we are very close,” ’ and on review, the California Supreme Court acknowledged that ‘it certainly looks suspicious that all three African-American prospective jurors were removed from the jury.’ [Citation.] Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under Batson.” (Johnson v. California, supra, 545 U.S. at p. 173.) In reaching this holding, the high court—though aware that the trial judge’s “own examination of the record had convinced her that the prosecutor’s strikes could be justified by race-neutral reasons,” i.e., “the black venire members had offered equivocal or confused answers in their written questionnaires” (id. at p. 165)—assigned no weight to this consideration and instead warned against “the imprecision of relying on judicial speculation to resolve plausible claims of discrimination” (id. at p. 173).
II.
Since Johnson v. California, this court has described the burden that a defendant must meet at Batson’s first step in accordance with the high court’s clarification of that standard. (See maj. opn., ante, at pp. 833, 834; People v. Lancaster (2007) 41 Cal.4th 50, 74 [58 Cal.Rptr.3d 608, 158 P.3d 157] [“A defendant establishes a prima facie case of discrimination ‘by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.’ (Johnson[ v. California], supra, 545 U.S. at p. 170.)”].) This court has also declined to accord deference to a trial court’s *869 determination that a defendant failed to establish a prima facie case when the trial court may have applied the “strong likelihood” or “more likely than not” standard disapproved by the high court. (See People v. Bell (2007) 40 Cal.4th 582, 597 [54 Cal.Rptr.3d 453, 151 P.3d 292] [“Where it is unclear whether the trial court applied the correct standard, we review the record independently to ‘apply the high court’s standard and resolve the legal question whether the record supports an inference that the prosecutor excused a juror’ on a prohibited discriminatory basis.”]; People v. Pearson (2013) 56 Cal.4th 393, 421 [154 Cal.Rptr.3d 541, 297 P.3d 793]; People v. Carasi (2008) 44 Cal.4th 1263, 1293 [82 Cal.Rptr.3d 265, 190 P.3d 616].) Today’s opinion properly follows this approach. (Maj. opn., ante, at pp. 834-835.)
Nevertheless, while correctly stating the Johnson v. California standard, this court has found no prima facie case in a variety of circumstances that seem clearly adequate to raise an inference of discrimination, including circumstances not very different from those in Johnson v. California. In such cases, including the one now before us, we have reached that result by invoking possible, but not obvious, reasons that a prosecutor might have given—but did not actually give—for striking a minority juror in order to negate an inference of discrimination that would otherwise arise from the circumstances. In so doing, our Batson step one jurisprudence commits the very mistake that Johnson v. California warned against: we routinely and erroneously “rely[] on judicial speculation to resolve plausible claims of discrimination.” (Johnson v. California, supra, 545 U.S. at p. 173.)
Moreover, our cases employ judicial speculation in a conspicuously lopsided way. When hypothesizing race-neutral characteristics that might explain the strike of a particular juror, we have categorically barred inquiry into whether those characteristics apply not only to the juror who was struck but also to one or more jurors who were not struck, even though such comparison clearly informs the explanatory power of any hypothesized reason for a strike. This runs afoul of the high court’s instruction that “[i]n deciding whether the defendant has made the requisite showing” at Batson’s first step, courts “should consider all relevant circumstances.” (Batson, supra, 476 U.S. at pp. 96-97, italics added.)
The upshot is that our application of Johnson v. California’s standard for establishing a prima facie case of discrimination prematurely cuts off inquiry into the prosecutor’s actual motivations. In this case and others, our approach at Batson’s first step authorizes “needless and imperfect speculation when a direct answer can be obtained by asking a simple question,” thereby undermining the Batson framework’s objective “to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.” (Johnson v. California, supra, 545 U.S. at p. 172.)
*870 A.
In the present case, the prosecutor struck the first two black prospective jurors who were available for challenge. Ultimately, a third black prospective juror, who worked as a correctional officer, was permitted to serve on the jury. Given the small number of black jurors, I agree that the prosecutor’s strikes of two black jurors did not amount to a pattern that conclusively raises an inference of discrimination. (Maj. opn., ante, at pp. 835-836.) At the same time, I note that the numbers here—two out of two black prospective jurors were struck at the time of defendant’s Batson motion, and ultimately two out of three were struck—are not so dissimilar from the three-out-of-three pattern that the high court in Johnson v. California considered virtually dispositive. (Johnson v. California, supra, 545 U.S. at p. 172.)
A “ ‘pattern’ ” of strikes against prospective jurors of a particular race is only one “example” of the “relevant circumstances” that must be considered in determining whether a defendant has established a prima facie case. (Batson, supra, 476 U.S. at pp. 96-97; see Snyder, supra, 552 U.S. at p. 478 [striking even one juror on the basis of race violates the federal Constitution]; People v. Montiel (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [same].) Here, there are several additional circumstances that, when considered together with the prosecution’s strikes of the first two black panelists available for challenge, are easily sufficient to raise an inference of discrimination.
First, defendant was a black man who was accused of raping and murdering a young white woman. As the court acknowledges, “ ‘[T]he social, racial and sexual overtones [of the case] were precisely the kind which could “most effectively prejudice” defendant.’ ” (Maj. opn., ante, at p. 829.) In such a case, a prosecutor’s exercise of peremptory challenges against prospective jurors of the defendant’s race may be especially suggestive of a racial motivation. (See Powers, supra, 499 U.S. at p. 416 [“Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution’s adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred.”]; People v. Johnson, supra, 30 Cal.4th at p. 1326 [the fact that “this case involves an African-American defendant charged with killing ‘his White girlfriend’s child’ ” is “obviously highly relevant to whether a prima facie case existed” where prosecutor struck three black jurors]; Wheeler, supra, 22 Cal.3d at p. 281 [“the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors *871 belong, these facts may also be called to the court’s attention”]; Madison v. Commissioner (11th Cir. 2012) 677 F.3d 1333, 1337 [“relevant circumstancés . . . include . . . ‘the subject matter of the case ... if it is racially or ethnically sensitive . . .’”].)
Second, the prosecutor was aware of specific facts that might have led him to believe the racially sensitive nature of this case would cause a juror’s race to be particularly salient. Before jury selection, as part of its motion for change of venue, the defense submitted a survey of Kem County residents conducted by an expert. The survey revealed that 16.7 percent of African Americans, in contrast to 57.5 percent of members of other races, prejudged defendant as guilty. The same survey also reported that 11.1 percent of African Americans, in contrast to 47.3 percent of members of other races, believed the death penalty would be the appropriate punishment if defendant were found guilty.
Even more concrete evidence of such racial division was the fact that the single juror who had refused to convict defendant of the rape and murder charges in the first trial was the sole African American on the jury. As defense counsel argued in making his Batson motion, this fact raised the concern that the prosecutor was “excusing African Americans on their race because he feels that they will not vote guilty this time.” Acting on such presumptions is precisely what Batson prohibits: the prosecution cannot “strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black.” (Batson, supra, 476 U.S. at p. 97.) In light of the facts known to the prosecutor, the strikes of the first two black prospective jurors available for challenge at least called for an explanation.
Finally, the two black jurors whom the prosecutor struck were strong supporters of the death penalty, and both gave clear answers suggesting that they would be willing and able to impose it. Prospective Juror H.C. indicated on his questionnaire that the death penalty was used “too seldom,” and he repeatedly and unequivocally affirmed during voir dire that he could vote for it. When the prosecutor asked Prospective Juror K.P. if she could “actually vote to return a verdict of death,” K.P. responded: “[I]f I believed he was guilty and . . . weighed all the options and all that and that’s what I thought, then I would have no problem voting that.”
Under Johnson v. California, the totality of these circumstances is more than adequate to raise an inference of discrimination.
B.
In reaching a contrary conclusion, today’s opinion hypothesizes various explanations that the prosecutor could have offered for striking these two *872 prospective jurors. The court observes that H.C. worked at the university and knew eight potential witnesses in the case. The court also notes several responses H.C. gave on his juror questionnaire that might have caused concern for the prosecutor, including one answer indicating that defendant’s race would make it more difficult for H.C. to consider the facts objectively. As for K.P., the court observes that her brother had been arrested for selling marijuana and that the case was pending in Kem County juvenile court at the time of defendant’s trial. The court also notes that K.P. said jury service would force her to drop some summer school classes, potentially interfering with her ability to transfer to a four-year college. (See maj. opn., ante, at pp. 835-836.)
The court’s reliance on these hypothesized reasons to negate the inference of discrimination otherwise arising from the circumstances reveals two related errors in our application of Batson’s first-stage inquiry.
1.
First, the mere fact that a court can find possible race-neutral reasons in the record for a prosecutor’s strikes does not negate an inference of discrimination at Batson's first step. The high court recognized this principle in Johnson v. California itself. In contrast to our opinion today, the high court in Johnson v. California declined to engage in any speculation as to possible reasons for the prosecutor’s strikes, even though it was aware-that the trial judge’s “own examination of the record had convinced her that the prosecutor’s strikes could be justified by race-neutral reasons. Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires.” (Johnson v. California, supra, 545 U.S. at p. 165.) Instead, the high court found an inference of discrimination at Batson's first step based on the fact that the prosecutor struck all three black prospective jurors in a case where a black defendant was charged with killing his white girlfriend’s child—full stop.
Because it is all too easy to comb the record and find some legitimate reason the prosecution could have had for striking a minority juror, dispelling an inference of discrimination otherwise arising from the totality of circumstances “requires more than a determination that the record could have supported race-neutral reasons for the prosecutor’s use of his peremptory challenges.” (Williams v. Runnels (9th Cir. 2006) 432 F.3d 1102, 1110.) Of course, there may be circumstances where the explanation for a prosecutor’s strike of a particular juror is so obvious that there is little or no reason to think anything else could have motivated the strike. (See, e.g., People v. Jones (2013) 57 Cal.4th 899, 982-983 (conc. opn. of Liu, J.) [“[The struck juror] was married to a convicted murderer. None of the seated or alternate jurors *873 had anything remotely similar in their backgrounds.”].) In such cases, trial courts need not and should not subject prosecutors to idle inquiry; they may swiftly and justifiably reject “a spurious claim interposed simply for purposes of harassment or delay.” (Wheeler, supra, 22 Cal.3d at p. 281.) However, “[i]n light of [Johnson v. California], an inquiry into apparent reasons is relevant only insofar as the strikes are so clearly attributable to that apparent, non-discriminatory reason that there is no longer any suspicion, or inference, of discrimination in those strikes.” (United States v. Stephens (7th Cir. 2005) 421 F.3d 503, 516.) As noted earlier, “[t]he Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question.” (Johnson v. California, supra, 545 U.S. at p. 172; see ibid. [“ ‘[I]t does not matter that the prosecutor might have had good reasons ...[;] [w]hat matters is the real reason they were stricken.’ ”].) Where, as here, the record reveals only possible but not obvious reasons for a strike, reliance on such reasons to reject a Batson claim at the first step effectively short-circuits the three-step framework and defeats the essential inquiry into whether the possible reasons for a strike were the prosecutor’s actual reasons.
Justice Kennard, writing separately, contends that the pending charge in Kem County juvenile court against K.P.’s brother and H.C.’s indication on his juror questionnaire that defendant’s race would make it more difficult for him to consider the facts objectively were “obvious” race-neutral reasons for the prosecutor’s strikes. (Conc. opn. of Kennard, J., ante, at pp. 861-862.) It is telling, however, that no other member of the court claims that these reasons, or any others, were “obvious”—and for good reason. During voir dire, the prosecutor asked H.C.: “[I]f you hear the evidence and you’re persuaded that the defendant committed one or more of the crimes charged against him, would you hesitate to find him guilty because of his ethnic background?” H.C. answered: “No.” And elsewhere on H.C.’s questionnaire, H.C. checked “Yes” in response to the question: “If it were to develop in this case that the testimony of black witnesses contradicts the testimony of white witnesses, all other things being equal, would you be able [to] give equal credit to both?” These responses tend to mitigate any concern the prosecutor might have had about H.C.’s ability to consider the facts objectively in this case. Of course, the prosecutor still could have had a genuine concern about H.C.’s objectivity. But any such concern was not so obvious as to eliminate the need for the prosecutor to state his actual concern on the record.
As for K.P., the pending charge against her brother, considered in isolation, may appear to explain the prosecutor’s strike. But it is a far less obvious explanation when one realizes that no fewer than six seated jurors—five white *874 and one Hispanic—each disclosed a similar negative association with the criminal justice system. (See post, at pp. 876-879.) At Batson’s first stage, “reliance on common juror characteristics that could explain the prosecution’s peremptories ‘risk[s] collapsing all three of Batson’s steps into the prima facie inquiry.’ ” (Bennett v. Gaetz (7th Cir. 2010) 592 F.3d 786, 792 (Bennett).) Again, it may be that the pending charge against K.P.’s brother was actually why the prosecutor struck K.P. But it is far from obvious, given what we know about several jurors whom the prosecutor did not strike.
2.
I will elaborate in a moment the comparative juror analysis relevant to K.P. As a preface to that discussion, it is important to note the second error in our first-stage Batson jurisprudence that today’s opinion perpetuates: This court categorically rejects the relevance of comparative juror analysis at Batson’s first step. Today’s opinion restates our rule: “When a trial court has found no prima facie showing, and the prosecutor has declined to state his reasons for the excusals, we have declined to conduct a comparative juror analysis. [Citation.]” (Maj. opn., ante, at p. 836.) This rule is flatly inconsistent with our obligation to consider “all relevant circumstances” in deciding whether a defendant has made a prima facie case of discrimination. (Batson, supra, 476 U.S. at pp. 96-97.)
Comparative juror analysis involves determining .whether a race-neutral reason that a party might have had for striking a prospective juror also applies to one or more prospective jurors whom the party did not strike. It is “one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination.” (People v. Lenix (2008) 44 Cal.4th 602, 622 [80 Cal.Rptr.3d 98, 187 P.3d 946] (Lenix).) As the high court has explained: “If a prosecutor’s proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson’s third step.” (Miller-El, supra, 545 U.S. at p. 241.) By the same logic, if a court’s hypothesized reason for a prosecutor’s strike of a black panelist “applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered” at Batson’s first step. (Ibid.)
Before the high court’s decisions in Miller-El and Snyder, this court had refused to conduct comparative juror analysis for the first time on appeal at either Batson’s first or third stage, holding such an inquiry to be “unreliable and inconsistent with the deference reviewing courts necessarily give to trial courts.” (People v. Johnson, supra, 30 Cal.4th at p. 1318.) Miller-El and Snyder engaged in extensive comparative juror analysis at Batson’s third *875 stage in the course of deciding that the defendants in those cases had proven racial discrimination. (See Miller-El, supra, 545 U.S. at pp. 241-252; Snyder, supra, 552 U.S. at pp. 483-485.) In light of those decisions, we now engage in comparative juror analysis at Batson’s third stage even if the analysis was not conducted below. (Lenix, supra, 44 Cal.4th at p. 607.)
At Batson’s first stage, however, this court continues to resist comparative juror analysis on the theory that such analysis “has little or no use where the analysis does not hinge on the prosecution’s actual proffered rationales.” (People v. Bonilla (2007) 41 Cal.4th 313, 350 [60 Cal.Rptr.3d 209, 160 P.3d 84] (Bonilla).) Even when a court hypothesizes reasons that the prosecution might have given for striking a juror, our precedent has consistently held that it is unnecessary and inappropriate to compare the struck juror with other jurors to see whether the hypothetical reasons might also have applied to them. (See, e.g., People v. Streeter (2012) 54 Cal.4th 205, 225-226 & fn. 5 [142 Cal.Rptr.3d 481, 278 P.3d 754]; People v. Clark (2011) 52 Cal.4th 856, 907-908 & fn. 13 [131 Cal.Rptr.3d 225, 261 P.3d 243] (Clark); People v. Hawthorne (2009) 46 Cal.4th 67, 80, fn. 3 [92 Cal.Rptr.3d 330, 205 P.3d 245]; Bonilla, at pp. 343, 347-350.)
Our prohibition on comparative juror analysis at Batson’s first stage is contrary to clearly established law. Batson made clear that in determining whether a defendant has made a prima facie case, a court must consider “all relevant circumstances.” (Batson, supra, 476 U.S. at pp. 96-97.) If a court hypothesizes race-neutral reasons the prosecution might have given for striking a particular juror, isn’t it relevant to inquire whether those reasons applied equally to other jurors? Comparative juror analysis tests whether a proffered reason for striking a juror is likely to have been the actual reason for the strike. (See Miller-El, supra, 545 U.S. at p. 241; Lenix, supra, 44 Cal.4th at p. 618, fn. 13.) Such comparison is equally relevant whether the reason was proffered by the prosecution for examination at Batson’s third stage or whether the reason was proffered by the trial court, by the Attorney General, or by this court for consideration at Batson’s first stage.
This approach, dictated by logic and fairness, is not novel. Many courts have recognized the relevance of comparative juror analysis at Batson’s first stage. (See, e.g., Boyd v. Newland (9th Cir. 2006) 467 F.3d 1139, 1149 [“[Bjecause comparative juror analysis assists a court in determining whether the totality of the circumstances gives rise to an inference of discrimination, we believe that this analysis is called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the Batson analysis.”]; People v. Davis (2008) 231 Ill.2d 349 [326 Ill.Dec. 21, 899 N.E.2d 238, 246] [“We see no reason why a comparative juror analysis would not also be a relevant factor in the totality of factors that must *876 be considered in determining whether a prima facie case exists in the first instance.”]; Bennett, supra, 592 F.3d at p. 792 [“[T]he jurors’ experience with crime seems an implausible reason for the peremptories. Although the two African-Americans struck by the prosecution testified that they had been crime victims, so too did at least four non-African-Americans who ultimately served as jurors.”]; U.S. v. Hughes (8th Cir. 1989) 880 F.2d 101, 103; State v. Rhone (2010) 168 Wn.2d 645 [229 P.3d 752, 757]; Keeton v. State (Tex.Crim.App. 1988) 749 S.W.2d 861, 867-868; Ex parte Branch (Ala. 1987) 526 So.2d 609, 623.)
As noted, today’s opinion restates and does not disavow this court’s prohibition on comparative juror analysis at Batson’s first step. (Maj. opn., ante, at p. 836.) But the court then proceeds to conduct an analysis purporting to show that its hypothesized reasons for the prosecutor’s strikes of H.C. and K.P. do not apply to other prospective jurors. (Id. at pp. 836-837.) Since the court continues to adhere to the position that comparative juror analysis is irrelevant in first-stage Batson analysis, it is unclear why the court, for the first time in our case law, feels the need to undertake such analysis in this case—unless the court actually does recognize the relevance of comparative juror analysis, in which case the court should follow Justice Kennard’s example and forthrightly declare a “change of view.” (Conc. opn. of Kennard, J., ante, at p. 863.) In any event, whether or not the court in deed, if not in word, has signaled a retreat from its established rule, its rendition of comparative juror analysis does not dislodge the inference of discrimination in the present case.
Consider the two reasons that today’s opinion hypothesizes for the prosecutor’s strike of K.P. First, K.P.’s brother had been charged in Kern County juvenile court with selling marijuana, and the court says the prosecutor could have been concerned that K.P. “might be biased against the prosecution and law enforcement agencies that were currently prosecuting her brother. (See, e.g., People v. Booker (2011) 51 Cal.4th 141, 167, fn. 13 [119 Cal.Rptr.3d 722, 245 P.3d 366] [family member’s negative experience with the criminal justice system is a race-neutral reason for a peremptory challenge].)” (Maj. opn., ante, at p. 836.) But if “negative experience with the criminal justice system” was the concern, one might expect the prosecution to have been equally concerned about three seated jurors who had been convicted of misdemeanors in Kern County—one for misdemeanor assault and battery four years earlier, a second for drunk driving four years earlier, and a third for misdemeanor petty theft. A fourth seated juror had a best friend who had been convicted of a felony drug crime in Kern County two or three years earlier. A fifth had a brother who had been convicted of a misdemeanor about four years earlier. And a sixth seated juror had a brother who had been convicted of child molestation and was currently in California state prison. *877 My colleagues observe that K.P., unlike the seated jurors, had an immediate family member “currently” being prosecuted by the same district attorney’s office that was prosecuting defendant. (Maj. opn., ante, at p. 837; see id. at p. 837 [“Unlike K.P.’s brother’s case, . . . none of these was pending in the very county where defendant was being tried.”]; conc. opn. of Kennard, J., ante, at p. 863 [same].) The significance of this distinction eludes me. If anything, one might reasonably believe that jurors who had themselves been convicted or whose close friends or immediate family members had been convicted of crimes in Kern County would be equally if not more prone to bias against this district attorney’s office than a juror whose brother had been charged but not convicted. Indeed, to support its hypothesis that the prosecutor struck K.P. because of the pending charge against her brother, the court cites People v. Booker, supra, 51 Cal.4th 141, a case where a black juror struck by the prosecution had a brother who had been convicted of manslaughter. (Id. at p. 164; see maj. opn., ante, at p. 836.) Although the juror “felt the outcome was fair” (People v. Booker, at p. 164), it was in that context that we said, “A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge” (id. at p. 167, fn. 13). We have often held that a juror’s prior criminal conviction is a fully legitimate and understandable reason for prosecutorial concern when rejecting a Batson claim. (See, e.g., People v. Lomax (2010) 49 Cal.4th 530, 575 [112 Cal.Rptr.3d 96, 234 P.3d 377] [stricken juror had suffered a prior misdemeanor conviction for receiving stolen property]; People v. Williams (2006) 40 Cal.4th 287, 311 [52 Cal.Rptr.3d 268, 148 P.3d 47] [stricken juror had suffered “two driving under the influence misdemeanor convictions prosecuted by the same office that was trying this case, one of which was approximately five years before the trial”].) Here, I do not see why the fact that six seated jurors had prior convictions, rather than pending charges, against themselves or their close friends or family members—and, in the case of at least three seated jurors, convictions obtained by the Kem County District Attorney’s Office within the past four years—would have posed a lesser concern to the prosecutor than the pending, unadjudicated charge against K.P.’s brother.
Second, the court posits that serving as a juror would interfere with KJP.’s college education, as she would be forced to forgo taking summer school classes. (Maj. opn., ante, at p. 836.) The court speculates that the prosecutor could have concluded that K.P.’s “concerns about completing her education might impair her ability to focus on the case and serve as an impartial juror.” (Ibid.) Of course, if having to drop summer school classes was a major detriment, K.P. would have been excused for hardship, but she was not. More to the point, other jurors complained of similar—and, in one case, very similar—hardships. One white seated juror was the sole manager of an American Legion post, and he was concerned he would be unable to find *878 someone to replace him for the full length of the trial. He would also be forced to miss a week-long Marine Corps League convention he had committed to attending, which, as the trial court observed, was “[o]bviously . . . something [he] would like to do.” Another white seated juror raised almost precisely the same concerns as K.P.: she was also a college student and would also be forced to drop out of summer school classes for which she was then registered. When asked by the court if she would be able to take the same classes the next year, she said she was unsure. (Cf. Snyder, supra, 552 U.S. at pp. 483-484 [prosecution sought to explain the strike of a black panelist on the ground that serving as a juror would interfere with his student teaching obligations; high court rejected this explanation at Batson’s third stage, observing that two white jurors had disclosed comparable hardships].)
One could certainly attempt to draw distinctions between K.P. and the similarly situated nonblack jurors whom the prosecution did not strike. Perhaps the fact that K.P.’s brother was currently being prosecuted for a crime somehow caused the prosecutor to be marginally more concerned with K.P. than with the six seated jurors who had similar past experiences with the criminal justice system. Perhaps the prosecutor believed that dropping her summer school classes would be a particular distraction to K.P. because K.P. was also attempting to transfer to a four-year college, something the white seated juror who was forced to drop her summer school classes was not trying to do. Perhaps the prosecutor thought KJP.’s potential hardship was marginally greater than the potential hardship mentioned by the volunteer manager of the American Legion post. The court posits other speculative distinctions that the prosecutor might have found relevant and, for good measure, adds that “the combination of K.P.’s potential biases differentiated her from other prospective jurors.” (Maj. opn., ante, at pp. 837-838, italics added.)
We can stipulate, as an inarguable fact, that no two jurors are ever exactly alike, and it is easy enough to concatenate various differences so as to individuate a particular juror. But the high court has never “announce[d] a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. . . . A per se rule that a defendant cannot win a Batson claim unless there is an exactly identical [nonblack] juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters.” (Miller-El, supra, 545 U.S. at p. 247, fn. 6.) Even assuming the distinctions above are significant (and I do not think they are), the need to posit such fine distinctions among prospective jurors reveals why comparative juror analysis is relevant and important at Batson’s first stage. Batson’s first step requires only a showing sufficient to permit an inference of discrimination, not proof that discrimination was more likely than not the reason for the strike. (Johnson v. California, supra, 545 U.S. at pp. 168-170.) The possible reasons a prosecutor might *879 have given for striking a juror are not especially probative at Batson’s first stage unless they are truly obvious. The finer the distinction that must be drawn between a black juror who was struck and a nonblack juror who was not, the less likely it is that the purported distinction actually explains the strike. It is at least debatable whether the pending charge against KJP.’s brother was of greater concern to the prosecutor than the prior convictions suffered by six seated jurors or their close friends or family members. And it is at least debatable whether K.P.’s worry that jury service would interfere with her studies was of greater concern to the prosecutor than the similar worry expressed by the white college student who did not want to drop out of the summer school classes for which she had already registered. The first stage of the Batson inquiry is not the proper place to resolve these debatable points. The prosecutor may well have acted lawfully. But the totality of circumstances in this case permits an inference of discrimination, and the trial court should have asked the prosecutor to state his reasons.
In sum, the purpose of the Batson inquiry is to ensure that the actual reasons for striking a minority juror are not discriminatory, not to invite courts to guess at possible reasons. Where, as here, the record discloses only possible but not obvious reasons for the strike of a minority juror, a court should not conclude on that basis—in the face of other circumstances suggestive of discrimination—that the defendant failed to establish a prima facie case. And in determining how likely or obvious it is that a hypothesized reason was the prosecutor’s actual reason for the strike, a court must consider “all relevant circumstances” bearing on the prosecutor’s motives, including comparative juror analysis. (Batson, supra, 476 U.S. at pp. 96-97; see Miller-El, supra, 545 U.S. at p. 252.) The court’s first-stage Batson analysis in this case underscores “the imprecision of relying on judicial speculation to resolve plausible claims of discrimination.” (Johnson v. California, supra, 545 U.S. at p. 173; see Miller-El, at p. 252 [“A Batson challenge does not call for a mere exercise in thinking up any rational basis.”].) The court applies an unduly elevated standard for establishing a prima facie case of discrimination, collapsing a three-step analysis designed to elicit and evaluate the actual reasons for a prosecutor’s strike into a one-step analysis designed to generate and validate judicially hypothesized reasons for the strike.
III.
Notwithstanding the analysis above, my concurrence with today’s judgment stems from a recognition that our decisions applying Johnson v. California, supra, 545 U.S. 162, have firmly settled on the erroneous approach that produces the erroneous result today, and the high court has not expounded any intervening law that supersedes or further explains the standards set forth in Johnson v. California. (See People v. Latimer (1993) 5 *880 Cal.4th 1203, 1212-1213 [23 Cal.Rptr.2d 144, 858 P.2d 611] [discussing stare decisis]; Alleyne v. United States (2013) 570 U.S. __, __ [186 L.Ed.2d 314, 133 S.Ct. 2151, 2164] (conc. opn. of Sotomayor, J.) [same]; cf. Williams, supra, 56 Cal.4th at p. 715 (dis. opn. of Liu, J.) [this court’s rule of deference to trial court at Batson’s third step, adopted prior to Miller-El and Snyder, should be reconsidered in light of those decisions].) But the fact that our jurisprudence appears quite entrenched only heightens the need for a course correction by higher authority. Today’s opinion adds to a pattern of decisions by this court that “engag[e] in needless and imperfect speculation” to defeat Batson’s objective of eliciting “actual answers to suspicions and inferences” of discrimination. (Johnson v. California, supra, 545 U.S. at p. 172.)
In People v. Hoyos (2007) 41 Cal.4th 872 [63 Cal.Rptr.3d 1, 162 P.3d 528] (Hoyos), for example, this court found no inference of discrimination in a case where the defendant was Hispanic and the prosecution struck all three Hispanic female jurors while leaving one Hispanic man on the panel. (Id. at pp. 900-903.) The court correctly stated the Johnson v. California standard for Batson’s first-stage inquiry and, based on its own independent examination of the record, found possible race-neutral explanations for each of the three strikes against Hispanic female jurors. In one instance, “both the prosecutor and defendant’s own counsel were reasonably concerned about the prospective juror’s English language skills . . . .” (Hoyos, supra, 41 Cal.4th at p. 902.) In the other two instances, the reason was not so clear-cut. According to the court, during voir dire one juror, L.H., appeared “equivocal about the death penalty” and possibly “biased against it” (id. at p. 902); the other, Y.M., “had strong feelings against the death penalty” (id. at p. 903). But L.H. said “she could keep an open mind” (id. at p. 902), and Y.M. said “she could sit as a juror in this case” (id. at p. 903); in both cases, the trial court denied the prosecutor’s challenge for cause. Without examining whether non-Hispanic female jurors whom the prosecutor did not strike had expressed similar reservations about the death penalty, the court in Hoyos simply concluded that the prosecutor could have “had grounds for concern” about both jurors and therefore “was entitled to excuse” them. (Id. at p. 902.) The court nowhere acknowledged that in Johnson v. California the trial court’s finding of “ ‘ “grounds upon which the prosecutor might reasonably have challenged the jurors in question” ’ ” (Hoyos, at p. 900) played no role in the Batson step one analysis. (See Johnson v. California, supra, 545 U.S. at pp. 165, 173.)
In Clark, supra, 52 Cal.4th 856, the defendant, a black man, was charged with the murder and attempted rape of a 14-year-old white girl and with the kidnapping and attempted murder of a 15-year-old girl who was also white. (Id. at pp. 872-873.) During jury selection, the prosecution used peremptory challenges on four of the five black prospective jurors seated in the jury box. (Id. at pp. 904-905.) This court, upon independently reviewing the record, *881 held that the defendant failed to establish a prima facie case. (Id. at pp. 904, 908.) The court observed that the prosecutor had not challenged two of these four black prospective jurors at his first opportunity to do so and had permitted the fifth and final black prospective juror to serve on the jury. (Id. at p. 906.) Further, according to Clark, the record suggested race-neutral reasons that the prosecutor might have had for excusing the four black prospective jurors. One was an administrative law judge, and another was a licensed pastoral counselor who led religious services for the homeless. (Id. at p. 907.) As to the other two jurors, the hypothesized reasons were not at all obvious. One “had taken college courses in psychology” and said during voir dire that murderers “must have ‘something wrong with them in their mind’ the other said during voir dire that “he had no problem with the death penalty but believed that facts could be manipulated and anyone could be ‘hoodwinked’ by corrupt attorneys.” (Ibid.) Without inquiring whether any nonblack jurors whom the prosecutor did not strike had taken psychology courses or harbored some distrust of attorneys, the court simply concluded that “the record fails to support an inference that the prosecutor excused the four jurors in question because of their race. Rather, the record reflects race-neutral grounds for the peremptory challenges at issue.” (Id. at p. 908.)
Justice Kennard dissented from this holding in Clark, noting that “the prosecutor struck ‘most or all of the members of the identified group from the venire’ [citation]” after excusáis for cause, that “the four challenged jurors shared only one characteristic, that of their race, and otherwise were ‘as heterogeneous as the community as a whole’ [citation],” and that the “defendant was ‘a member of the excluded group’ [citation] and the victims appear to have been members of ‘the group to which the majority of the remaining jurors belong’ [citation].” (Clark, supra, 52 Cal.4th at p. 1011 (conc. & dis. opn. of Kennard, J.).) These facts together, she observed, gave rise to an inference of discrimination at Batson's first step. (Id. at pp. 1011-1012.)
In speculating on possible reasons for a prosecutor’s strike, this court has not limited itself to possible reasons that appear in the record. In People v. Hartsch (2010) 49 Cal.4th 472 [110 Cal.Rptr.3d 673, 232 P.3d 663] (Hartsch), the court found no prima facie case of discrimination where the prosecutor struck four of the first five, and five of the first seven, black panelists. (Id. at pp. 485-486.) The court observed that by the time the trial court heard the Batson motion, the prosecutor had accepted two black panelists: one “was employed as a school resource officer in a position ‘akin to law enforcement’ ” (id. at p. 485), and the other “favored the death penalty” (id. at p. 487). The court also noted that “. . . African-Americans were represented on the panel in a proportion roughly equal to their representation in the candidate pool . . .” whereas whites were slightly underrepresented. (Id. at p. 488.) The court went on to posit nonracial reasons appearing in the record that might have explained four of the five strikes against black *882 jurors. (Id. at pp. 488-489.) But the court undertook no comparative juror analysis to determine whether the hypothesized reasons, such as one black juror’s purported “reluctance to resolve conflicts in the evidence and discomfort with scientific evidence” (id. at p. 488), applied to one or more nonblack jurors who were not struck.
A fifth black juror who was struck in Hartsch was “a supporter of the death penalty who believed it was imposed ‘too seldom’ ” and “gave no responses in her questionnaire that would plainly appear to have given a prosecutor pause.” (Hartsch, supra, 49 Cal.4th at p. 488.) The court acknowledged that “the objective factors supporting the challenge ... are unclear.” (Id. at p. 489, fn. 16.) “However,” the court said, “the challenge of a single apparently qualified prospective juror does not suggest racial discrimination, ‘particularly “given the legitimate role that subjective factors may have in a prosecutor’s decision” to challenge or not challenge jurors peremptorily. [Citation.]’ [Citation.] [¶] ‘Myriad subtle nuances’ not reflected on the record may shape an attorney’s jury selection strategy, ‘including attitude, attention, interest, body language, facial expression and eye contact.’ [Citation.]” (Ibid.) In making these speculative assertions, the court in Hartsch did not mention the high court’s admonition that “ ‘[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose.’ ” (Snyder, supra, 552 U.S. at p. 478.) Nor did Hartsch mention that the high court in Snyder refused to credit a prosecutor’s actual (much less hypothesized) reliance on a black juror’s demeanor—in that case, “nervousness”—to explain a strike where the trial court had made no “specific finding on the record concerning [the juror’s] demeanor.” (Snyder, at p. 479.)
These precedents of our court stand in stark contrast to a substantial body of decisions by other courts that have found an inference of discrimination in circumstances less suggestive of racial discrimination than those present here. (See, e.g., Crittenden v. Ayers (9th Cir. 2010) 624 F.3d 943, 955-956 (Crittenden) [prima facie case where prosecution struck the only black prospective juror, who appeared similar to two white jurors in many respects and whom the prosecution had tried to strike for cause on the basis of her general objections to the death penalty]; U.S. v. Collins (9th Cir. 2009) 551 F.3d 914, 921-923 (Collins) [prima facie case where prosecution struck the only black prospective juror, who was not questioned at length by the prosecution and appeared in general to be similarly situated to other jurors who were allowed to serve]; U.S. v. Abdush-Shakur (10th Cir. 2006) 465 F.3d 458, 470 [“Striking two out of three minority panel members ... is sufficient to satisfy a defendant’s prima facie Batson claim, especially when the jurors were apparently the only two stricken.”]; Heno v. Sprint/United Management Co. (10th Cir. 2000) 208 F.3d 847, 854 [“Ms. Heno met her prima facie case by showing that Sprint used a peremptory to strike the only black juror on the panel.”]; Morse v. Hanks (7th Cir. 1999) 172 F.3d 983, 985 [prima facie case *883 where prosecution struck the only black venireman, voir dire was “perfunctory,” and juror had not given “an answer that would expose a clear basis for the state to want to remove him”]; U.S. v. Roan Eagle (8th Cir. 1989) 867 F.2d 436, 441 [prima facie case where defendant was American Indian and prosecution stmck the lone American-Indian panelist]; U.S. v. Clemons (3d Cir. 1988) 843 F.2d 741, 748 [finding a prima facie case “would clearly have been permissible” in case where defendant was black and prosecution stmck both black panelists]; State v. Hicks (2008) 163 Wn.2d 477 [181 P.3d 831, 838] [trial court judge acted “well within his discretion” in finding prima facie case where prosecution stmck the sole black panelist, defendants were black, and prosecution engaged in only limited questioning of the stmck juror]; Highler v. State (Ind. 2006) 854 N.E.2d 823, 827 [removal of the only African American on the panel “ ‘raise[s] an inference that the juror was excluded on the basis of race’ ”]; Hollamon v. State (1993) 312 Ark. 48 [846 S.W.2d 663, 666] [“defendant must first establish a prima facie case of purposeful discrimination, which the appellant clearly did in this case when he pointed to a peremptory strike by the state dismissing the sole black person on the jury”]; People v. Hernandez (1990) 75 N.Y.2d 350 [552 N.E.2d 621, 623, 553 N.Y.S.2d 85] [“The exercise of prosecutorial peremptory challenges to exclude the only [two] Latino jurors in the prosecution of a Latino defendant is enough . . . .”], affd. sub nom. Hernandez v. New York (1991) 500 U.S. 352 [114 L.Ed.2d 395, 111 S.Ct. 1859]; State v. Walker (1990) 154 Wis.2d 158 [453 N.W.2d 127, 135] [prima facie case where defendant was black and prosecution stmck the sole black panelist].)
Unlike our precedents, most of the cases above do not engage in speculation as to why a prosecutor might have stmck a minority juror. In the few cases that do posit nonobvious reasons, such as a juror’s views on the death penalty, the hypothesized reasons appeared in the record, and the court employed comparative juror analysis to test whether a hypothesized reason was likely the actual reason. (See Crittenden, supra, 624 F.3d at p. 956; Collins, supra, 551 F.3d at pp. 921-922.) All of the cases are united by an understanding that Batson's first step is not meant to be particularly onerous because at that point it is “impossible for the defendant to know with certainty” all the relevant facts (Johnson v. California, supra, 545 U.S. at p. 170) and because “proceeding to the second step of the Batson test puts only a slight burden on the government” (Collins, at p. 920). At the second step, the prosecution need only state its actual reasons for striking a minority juror. The prosecutor does not bear any burden to disprove discrimination; “the defendant ultimately carries the ‘burden of persuasion’ to ‘ “prove the existence of purposeful discrimination.” ’ [Citation.] This burden of persuasion ‘rests with, and never shifts from, the opponent of the strike.’ [Citation.]” (Johnson v. California, at pp. 170-171.)
*884 The overriding constitutional interests in eradicating racial discrimination in jury selection and ensuring public confidence in our justice system (Johnson v. California, supra, 545 U.S. at pp. 171-172; Powers, supra, 499 U.S. at pp. 411-414; Batson, supra, 476 U.S. at pp. 87-88), together with the comparatively low cost of requiring a party to state its actual reasons for striking a minority prospective juror, have led some states to essentially eliminate Batson's first step. (See, e.g., State v. Rayfield (2006) 369 S.C. 106 [631 S.E.2d 244, 247]; Melbourne v. State (Fla. 1996) 679 So.2d 759, 764; State v. Parker (Mo. 1992) 836 S.W.2d 930, 940; State v. Holloway (1989) 209 Conn. 636 [553 A.2d 166, 171-172].) This court obviously has not adopted that approach, and I do not urge us to do so. But we have recognized that “it is the better practice for the trial court to have the prosecution put on the record its race-neutral explanation for any contested peremptory challenge, even when the trial court may ultimately conclude no prima facie case has been made out.” (Bonilla, supra, 41 Cal.4th at p. 343, fn. 13.) In essence, we have counseled against a “don’t ask, don’t tell” approach to the Batson inquiry because requiring a party to state its reasons “may assist the trial court in evaluating the challenge and will certainly assist reviewing courts in fairly assessing whether any constitutional violation has been established.” (Ibid.; see Hartsch, supra, 49 Cal.4th at p. 490, fn. 17.)
The present case illustrates the problems with our doctrine. Despite the racial overtones of this case, it is entirely possible that the prosecutor struck the two black prospective jurors for legitimate, race-neutral reasons. But because the trial court did not require the prosecutor to state his reasons, we can only speculate as to what his actual reasons were. Such speculation— especially with, but even without, comparative juror analysis—cannot dislodge the reasonable inference of discrimination arising from the circumstances here. To cut short the analysis of defendant’s Batson claim, as today’s opinion does, subverts the established framework for ferreting out unlawful discrimination in the exercise of peremptory strikes.
IV.
The confluence of today’s opinion and another questionable decision filed earlier this term (see Williams, supra, 56 Cal.4th 630) prompts a few broader observations about the state of our Batson jurisprudence.
Whether intended or not, our approach at Batson's first step gives rise to a tacit understanding that if the prosecution does not state its reasons for striking a minority prospective juror, either because the trial court did not ask or because the trial court asked but did not require an answer, a reviewing court will stand ready to fill in the blank with speculation and presumptions. This mode of judicial rationalization parallels our approach at Batson’s third *885 step in the not-infrequent situation where a trial court simply denies the motion with no explicit findings or analysis. In such cases, our precedent holds that deference to the trial court’s ruling is required so long as “the prosecutor’s reasons for excusing the juror are neither contradicted by the record nor inherently implausible.” (People v. Reynoso (2003) 31 Cal.4th 903, 929 [3 Cal.Rptr.3d 769, 74 P.3d 852] (Reynoso); see Williams, supra, 56 Cal.4th at p. 653.) As I have discussed in Williams (see Williams, at pp. 700, 709-713 (dis. opn. of Liu, J.)) and in another case filed today (see Mai, supra, 57 Cal.4th at pp. 1059-1067 (conc. opn. of Liu, J.)), this rule, which conflicts with ample state and federal authority, permits and indeed compels appellate courts to rationalize a trial court’s silence, with the result that a Batson claim may be rejected even when there is no affirmative indication that any court, trial or appellate, has carefully evaluated “all of the circumstances that bear upon the issue” of purposeful discrimination. (Snyder, supra, 552 U.S. at p. 478; see Miller-El, supra, 545 U.S. at p. 239; Batson, supra, 476 U.S. at p. 96.) The tacit understanding is that if a trial court denies a Batson claim with no findings or analysis showing that it conducted a proper third-stage Batson inquiry, a reviewing court will again stand ready to fill in the blank with speculation and presumptions. Just as our Batson step one doctrine tends to encourage (or at least does not discourage) a “don’t ask, don’t tell” policy between trial courts and prosecutors, our rule of unwarranted deference at Batson’s, third step effectively amounts to a “don’t ask, don’t tell” policy between reviewing courts and trial courts. (See Mai, at p. 1075 (conc. opn. of Liu, J.).)
The practical consequence of our approach is readily apparent. Over the past two decades, this court has encountered Batson claims in a total of 102 cases. (See appen., post, at pp. 892-898.) Among those 102 cases, this court found only a single instance of Batson error—and that was over 12 years ago in a case where the prosecutor, believing that the jury in the first trial had “ ‘hung ... on racial grounds,’ ” struck all five Hispanic members of the venire and all but announced his desire not to have any Hispanic person serve on the second jury. (Silva, supra, 25 Cal.4th at p. 375, italics omitted.) It is true that for much of the past 20 years, we applied standards that were less protective than those eventually set forth by the United States Supreme Court in Johnson v. California and Miller-El, which were jointly released in June 2005. Nevertheless, 59 of our 102 decisions involving Batson issues over the past two decades were filed after Johnson v. California and Miller-El, and not a single one of those decisions found a Batson error.
Even assuming, realistically, that most Batson claims raised in our court are fairly insubstantial, it is not difficult to identify cases that have presented *886 closer questions. (See, e.g., Williams, supra, 56 Cal.4th at pp. 649-663 [prosecutor struck first five black women in jury box and, in each instance, vaguely stated that challenged juror would hesitate to impose death penalty; trial judge had stopped taking notes and could not independently assess prosecutor’s reasons for striking at least two black women; principal defense witness was a black woman]; People v. Thomas (2012) 53 Cal.4th 771, 795 [137 Cal.Rptr.3d 533, 269 P.3d 1109] [“no obvious reason . . . why the prosecutor would have chosen to strike” two black prospective jurors]; Clark, supra, 52 Cal.4th at pp. 904-908 [prosecutor struck four of five black prospective jurors; hypothesized reasons at Batson step one were not subject to comparative juror analysis]; Hartsch, supra, 49 Cal.4th at pp. 488-489 & fn. 16 [no apparent reason for strike of a qualified black prospective juror who supported the death penalty]; People v. Mills (2010) 48 Cal.4th 158, 176-181 [106 Cal.Rptr.3d 153, 226 P.3d 276] [“the prosecutor challenged all six African-Americans who were at one time or another seated in the box”; prosecutor struck one black prospective juror because of her views on death penalty, despite minor differences with views of nonblack jurors who were not struck]; Hoyos, supra, 41 Cal.4th at pp. 902-903 [prosecutor struck all three Hispanic female prospective jurors; hypothesized reasons at Batson step one were not subject to comparative juror analysis].) It is no doubt true that “[j]ury selection is, and should be, a highly individualized process” (People v. Williams, supra, 40 Cal.4th at p. 340 (conc. opn. of Corrigan, J.)), and there are many “subtle nuances” that “are seldom captured by the written record” (id. at p. 339). But even allowing for the fact-specific judgments inherent in each case and the “great many legitimate factors that an advocate may properly consider in the exercise of peremptory challenges” (ibid.), the nearly absolute uniformity of results produced by this court’s Batson jurisprudence is striking.
By contrast, a number of federal courts of appeals, attentive to the proper application of Batson’s three-step framework, have repeatedly declined to affirm erroneous or inadequate Batson rulings in the years since Johnson v. California and Miller-El. (See, e.g., Price v. Cain (5th Cir. 2009) 560 F.3d 284, 287; Reed v. Quarterman (5th Cir. 2009) 555 F.3d 364, 382 (Reed); U.S. v. Williamson (5th Cir. 2008) 533 F.3d 269, 277; Harris v. Hardy (7th Cir. 2012) 680 F.3d 942, 965-966; U.S. v. Rutledge (7th Cir. 2011) 648 F.3d 555, 560; U.S. v. Taylor (7th Cir. 2011) 636 F.3d 901, 906 (Taylor); U.S. v. McMath (7th Cir. 2009) 559 F.3d 657, 665-666; U.S. v. Stephens (7th Cir. 2005) 421 F.3d 503, 518; Ali v. Hickman (9th Cir. 2009) 584 F.3d 1174, 1196; Paulino v. Harrison (9th Cir. 2008) 542 F.3d 692, 703; Green v. LaMarque (9th Cir. 2008) 532 F.3d 1028, 1033; Kesser v. Cambra (9th Cir. 2006) 465 F.3d 351, 371 (en banc); Williams v. Runnels (9th Cir. 2006) 432 F.3d 1102, 1108-1109; *887 Adkins v. Warden (11th Cir. 2013) 710 F.3d 1241, 1258 (Adkins); Madison v. Commissioner (11th Cir. 2012) 677 F.3d 1333, 1339; McGahee v. Alabama Dept. of Corrections (11th Cir. 2009) 560 F.3d 1252, 1267.) This body of authority provides an additional reason for skepticism as to whether our court has maintained the proper level of vigilance.
Our track record is even more remarkable when considered in light of what we have learned over the same period about the prevalence and persistence of racial disparities in the exercise of peremptory strikes as well as the mechanisms of conscious and unconscious bias that fuel those disparities, especially when it comes to black jurors and black defendants. In a recent study of how prosecutors exercised peremptory challenges in capital trials of all North Carolina inmates on death row as of July 1, 2010—a total of 173 proceedings involving 7,421 strikes—the authors found that “[o]ver the twenty-year period we examined, prosecutors struck eligible black venire members at about 2.5 times the rate they struck eligible venire members who were not black. These disparities remained consistent over time and across the state, and did not diminish when we controlled for information about venire members that potentially bore on the decision to strike them . . . ,” including views on the death penalty, prior experience with crime, employment status, and whether the jury knew any participant in the trial. (Grosso & O’Brien, A Stubborn Legacy: The Overwhelming Importance of Race in Jury Selection in 173 Post-Batson North Carolina Capital Trials (2012) 97 Iowa L.Rev. 1531, 1533-1534, 1542-1543, 1551 (Grosso & O’Brien).) Further, the study found that “although state strike rates are always higher against black venire members than against other venire members, the disparity is significantly greater in cases with black defendants.” (Id. at p. 1550; see id. at p. 1549 [“In cases with non-black defendants, the average strike rate was 51.4% against black venire members and 26.8% against all other venire members. In cases with black defendants, the average strike rate was 60.0% against black venire members and 23.1% against other venire members.” (fns. omitted)].)
The North Carolina study explained that “[n]one of the factors we controlled for in the regression analysis eliminated the effect of race in jury selection. While we found many non-racial factors that were highly relevant to the decision to strike, none was so closely associated with race or so frequent that it could serve as an alternative explanation of the racial disparities. ... A black venire member was still more than twice as likely (2.48 to 1) to be struck by the state even when other relevant characteristics were held constant.” (Grosso & O’Brien, supra, 97 Iowa L.Rev. at p. 1554.) The authors acknowledged that “we cannot account for a venire member’s physical appearance or body language—factors litigators often cite as relevant to their decision to strike.” (Id. at p. 1555.) “But factors like these *888 should generally be unrelated to the race of the venire member. Moreover, even if these factors were associated more with some racial groups than others, that association would have to be very strong and the factor quite frequent to explain the observed racial disparities.” (Ibid.)
A study of 317 capital trials in Philadelphia between 1981 and 1997 reported similar findings. (Baldus et al., The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis (2001) 3 U.Pa. J. Const. L. 3.) On average, prosecutors struck 51 percent of the black jurors, but only 26 percent of comparable nonblack jurors, whom they had the opportunity to strike. (Id. at p. 58, table 4, col. B.) In cases involving a black defendant and a nonblack victim, the disparity was even greater (57 percent versus 24 percent). (Id. at p. 58, table 4, col. C.) The role of race in jury selection remained significant even when nonracial juror characteristics such as age, occupation, education, and answers to voir dire questions were taken into account. (Id. at pp. 68-72, 122.)
Applying the methodology of the Philadelphia study, The Dallas Morning News examined peremptory strikes in 108 noncapital felony trials in Dallas during the first 10 months of 2002. (McGonigle et al., A Process of Juror Elimination: Dallas Prosecutors Say They Don’t Discriminate, but Analysis Shows They Are More Likely to Reject Black Jurors, The Dallas Morning News (Aug. 21, 2005), p. 1A [2005 WLNR 24658335].) Using regression analysis to control for age, education, occupation, socioeconomic status, and answers to voir dire questions, the study found that “[p]rosecutors excluded eligible blacks from juries at more than twice the rate they rejected eligible whites .... In fact, being black was the most important personal trait affecting which jurors prosecutors rejected .... Jurors’ attitudes toward criminal justice issues also played an important role, but even when blacks and whites answered key questions the same way, blacks were rejected at higher rates.” (Ibid.; see How the Analysis Was Done, The Dallas Morning News (Aug. 21, 2005), p. 19A [2005 WLNR 24657224].)
The findings above are consistent with other studies of actual trials. (See Louisiana Crisis Assistance Center, Black Strikes: A Study of the Racially Disparate Use of Peremptory Challenges by the Jefferson Parish District Attorney’s Office (2003); Rose, The Peremptory Challenge Accused of Race or Gender Discrimination? Some Data from One County (1999) 23 Law & Hum. Behav. 695; Turner et al., Race and Peremptory Challenges During Voir Dire: Do Prosecution and Defense Agree? (1986) 14 J. Crim.Just. 61.) They are also consistent with experimental research showing that study participants assigned to the role of a prosecutor are much more likely to strike black jurors than comparable nonblack jurors. In one study, researchers *889 told participants they had a single peremptory strike left to use on one of two jurors with characteristics potentially unattractive to a prosecutor: “Juror #1” was a 43-year-old married male “journalist who, several years earlier, had written articles about police misconduct,” and “Juror #2” was a 40-year-old divorced male “advertising executive with little scientific background Who stated during voir dire that he was skeptical of statistics because they are easily manipulated.” (Sommers & Norton, Race-based Judgments, Race-neutral Justifications: Experimental Examination of Peremptory Use and the Batson Challenge Procedure (2007) 31 Law & Hum. Behav. 261, 265.) Participants were randomly assigned to one of two conditions: either Juror #1 was depicted as black and Juror #2 as white, or vice versa. (Id. at p. 266.) The study found that as to Juror #1, participants struck him 77 percent of the time when he was black compared to 53 percent of the time when he was white, and as to Juror #2, participants struck him 47 percent of the time when he was black compared to 23 percent of the time when he was white. (Id. at p. 267.) Interestingly, when asked why they struck a particular juror, the study participants rarely mentioned race; virtually all participants “cited as their most important justification either Juror #l’s familiarity with police misconduct or Juror #2’s skepticism about statistics.” (Id. at pp. 267-268; see Hayden et al., Prosecutorial Discretion in Peremptory Challenges: An Empirical Investigation of Information Use in the Massachusetts Jury Selection Process (1978) 13 New Eng. L.Rev. 768, 784-785, 787-788 [jury selection simulation study involving 20 randomly selected prosecutors found that participants were more likely to ask about prospective juror’s race when defendant was black than when defendant was white, and that “a prosecutor would be very reluctant to remove a white juror by peremptory challenge where a black defendant is involved, without first making completely sure that there is solid justification for his removal”]; see generally Sommers & Norton, Race and Jury Selection: Psychological Perspectives on the Peremptory Challenge Debate (2008) 63 Amer. Psychologist 527.)
Of course, every case is different, and there are circumstances and nuances that these studies cannot fully address. A court cannot adjudicate broad patterns; we can only decide one case at a time. But patterns are comprised of individual cases decided in accordance with legal principles, and when those principles produce uniformity of results to the degree we have seen in our Batson jurisprudence, one has to wonder whether it can really be true that the exercise of peremptory strikes in the cases that come before our court differs so radically from the robust and consistent patterns observed elsewhere.
Like my colleagues, I am confident that our trial courts take seriously their responsibility to combat unlawful discrimination in jury selection. But where, *890 as here, it is not clear that a trial court has applied the correct standard at Batson’s first step, there is no dispute that a reviewing court must independently examine the record and apply the correct standard. (Maj. opn., ante, at p. 834.) At Batson’s third step, our trial courts are best positioned to assess the credibility of a prosecutor’s stated reasons because they are “experienced in supervising voir dire” (Batson, supra, 476 U.S. at p. 97) and because they “ ' “have first-hand knowledge and observation of critical events” ’ ” in the courtroom (Lenix, supra, 44 Cal.4th at p. 626). But jury selection can be a lengthy and complex process, and in the context of a particular strike, a trial court may have “stopped taking notes” (Williams, supra, 56 Cal.4th at p. 651), it may have neglected to consult the record of voir dire (id. at p. 716 (dis. opn. of Liu, J.)), it “may not have recalled [a juror’s] demeanor” (Snyder, supra, 552 U.S. at p. 479), it may have declined to engage in comparative juror analysis despite the urging of counsel (Mai, supra, 57 Cal.4th at p. 1048), it may have applied an erroneous legal standard (Reynoso, supra, 31 Cal.4th at pp. 933-934 (dis. opn. of Kennard, J.); Taylor, supra, 636 F.3d at pp. 905-906), or it may have made an unreasonable judgment under the totality of circumstances (Miller-El, supra, 545 U.S. at p. 266; Adkins, supra, 710 F.3d at p. 1255; Reed, supra, 555 F.3d at p. 382). Because it is the responsibility of appellate courts to be alert to these occasional lapses, it seems fair to ask whether our virtually uniform pattern of affirmances across 102 cases over the past 20 years demonstrates meaningful appellate review of Batson claims in accordance with proper legal standards.
When one examines the legal underpinnings of our Batson decisions, it is not difficult to understand why this court has almost never found unlawful discrimination in jury selection. Reflexive application of deference where there is nothing in the record to defer to, judicial speculation as to the reasons for a strike where the prosecutor has offered none, and unduly limited and grudging application of comparative juror analysis combine to erect a virtually impossible hurdle for Batson claims to surmount. As appellate judges, we are familiar with these lawyerly modes of rationalization and the predictable consequences of their repeated application. But a jurisprudence of speculation and presumptions does not serve the goal of producing “actual answers to suspicions and inferences that discrimination may have infected the jury selection process.” (Johnson v. California, supra, 545 U.S. at p. 172.) Nor does it adequately protect “the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.” (Batson, supra, 476 U.S. at pp. 85-86.) Most importantly, a jurisprudence of speculation and presumptions—and the stark results it has wrought—cannot inspire in all of our citizens, of whatever race or background, a full and equal measure of “confidence in the fairness of our system of justice.” (Id. at p. 87.)
*891 In sum, our Batson jurisprudence falls short of the vigilance required by the constitutional guarantee of equal protection of the laws. Nevertheless, under compulsion of this court’s precedent, I concur in the denial of defendant’s Batson claim and, in all other respects, join the opinion of the court.
Appellant’s petition for a rehearing was denied November 20, 2013.
*892 APPENDIX TO CONCURRING OPINION OF LIU, J.
Batson claims decided by the California Supreme Court, 1993-2013
1. People v. Jones (2013) 57 Cal.4th 899, 916-920
2. People v. Mai (2013) 57 Cal.4th 986, 1046-1054
3. People v. Harris (2013) 57 Cal.4th 804, 833-838
4. People v. Edwards (2013) 57 Cal.4th 658, 697-699
5. People v. DeHoyos (2013) 57 Cal.4th 79, 101-116 [158 Cal.Rptr.3d 797, 303 P.3d 1]
6. People v. Lopez (2013) 56 Cal.4th 1028, 1046-1050 [157 Cal.Rptr.3d 570, 301 P.3d 1177]
7. People v. Williams (2013) 56 Cal.4th 630, 649-663 [156 Cal.Rptr.3d 214, 299 P.3d 1185]
8. People v. Pearson (2013) 56 Cal.4th 393, 420-423 [154 Cal.Rptr.3d 541, 297 P.3d 793]
9. People v. McKinzie (2012) 54 Cal.4th 1302, 1310-1322 [144 Cal.Rptr.3d 427, 281 P.3d 412]
10. People v. Riccardi (2012) 54 Cal.4th 758, 783-797 [144 Cal.Rptr.3d 84, 281 P.3d 1]
11. People v. Streeter (2012) 54 Cal.4th 205, 220-226 [142 Cal.Rptr.3d 481, 278 P.3d 754]
12. People v. Thomas (2012) 53 Cal.4th 771, 795-796 [137 Cal.Rptr.3d 533, 269 P.3d 1109]
13. People v. Elliott (2012) 53 Cal.4th 535, 559-574 [137 Cal.Rptr.3d 59, 269 P.3d 494]
14. People v. Dement (2011) 53 Cal.4th 1, 18-21 [133 Cal.Rptr.3d 496, 264 P.3d 292]
15. People v. Clark (2011) 52 Cal.4th 856, 903-908 [131 Cal.Rptr.3d 225, 261 P.3d 243]
*893 16. People v. Blacksher (2011) 52 Cal.4th 769, 800-803 [130 Cal.Rptr.3d 191, 259 P.3d 370]
17. People v. Garcia (2011) 52 Cal.4th 706, 746-750 [129 Cal.Rptr.3d 617, 258 P.3d 751]
18. People v. Vines (2011) 51 Cal.4th 830, 847-854 [124 Cal.Rptr.3d 830, 251 P.3d 943]
19. People v. Thomas (2011) 51 Cal.4th 449, 471-475 [121 Cal.Rptr.3d 521, 247 P.3d 886]
20. People v. Jones (2011) 51 Cal.4th 346, 356-369 [121 Cal.Rptr.3d 1, 247 P.3d 82]
21. People v. Booker (2011) 51 Cal.4th 141, 161-169 [119 Cal.Rptr.3d 722, 245 P.3d 366]
22. People v. Cowan (2010) 50 Cal.4th 401, 445-451 [113 Cal.Rptr.3d 850, 236 P.3d 1074]
23. People v. Lomax (2010) 49 Cal.4th 530, 569-578 [112 Cal.Rptr.3d 96, 234 P.3d 377]
24. People v. Hartsch (2010) 49 Cal.4th 472, 485-190 [110 Cal.Rptr.3d 673, 232 P.3d 663]
25. People v. Thompson (2010) 49 Cal.4th 79, 105-109 [109 Cal.Rptr.3d 549, 231 P.3d 289]
26. People v. Taylor (2010) 48 Cal.4th 574, 611-617, 640-644 [108 Cal.Rptr.3d 87, 229 P.3d 12]
27. People v. Mills (2010) 48 Cal.4th 158, 173-185 [106 Cal.Rptr.3d 153, 226 P.3d 276]
28. People v. Taylor (2009) 47 Cal.4th 850, 885-896 [102 Cal.Rptr.3d 852, 220 P.3d 872]
29. People v. Davis (2009) 46 Cal.4th 539, 582-584 [94 Cal.Rptr.3d 322, 208 P.3d 78]
30. People v. Hawthorne (2009) 46 Cal.4th 67, 77-84 [92 Cal.Rptr.3d 330, 205 P.3d 245]
*894 31. People v. Hamilton (2009) 45 Cal.4th 863, 897-909 [89 Cal.Rptr.3d 286, 200 P.3d 898]
32. People v. Carasi (2008) 44 Cal.4th 1263, 1291-1295 [82 Cal.Rptr.3d 265, 190 P.3d 616]
33. People v. Cruz (2008) 44 Cal.4th 636, 654-661 [80 Cal.Rptr.3d 126, 187 P.3d 970]
34. People v. Lenix (2008) 44 Cal.4th 602, 611-631 [80 Cal.Rptr.3d 98, 187 P.3d 946]
35. People v. Salcido (2008) 44 Cal.4th 93, 135-144 [79 Cal.Rptr.3d 54, 186 P.3d 437]
36. People v. Watson (2008) 43 Cal.4th 652, 671-682 [76 Cal.Rptr.3d 208, 182 P.3d 543]
37. People v. Lewis (2008) 43 Cal.4th 415, 468-482 [75 Cal.Rptr.3d 588, 181 P.3d 947]
38. People v. Howard (2008) 42 Cal.4th 1000, 1016-1020 [71 Cal.Rptr.3d 264, 175 P.3d 13]
39. People v. Kelly (2007) 42 Cal.4th 763, 778-781 [68 Cal.Rptr.3d 531, 171 P.3d 548]
40. People v. Zambrano (2007) 41 Cal.4th 1082, 1101-1117 [63 Cal.Rptr.3d 297, 163 P.3d 4]
41. People v. Hoyos (2007) 41 Cal.4th 872, 899-903 [63 Cal.Rptr.3d 1, 162 P.3d 528]
42. People v. Thornton (2007) 41 Cal.4th 391, 461-463 [61 Cal.Rptr.3d 461, 161 P.3d 3]
43. People v. Bonilla (2007) 41 Cal.4th 313, 340-350 [60 Cal.Rptr.3d 209, 160 P.3d 84]
44. People v. Stevens (2007) 41 Cal.4th 182, 192-198 [59 Cal.Rptr.3d 196, 158 P.3d 763]
45. People v. Lancaster (2007) 41 Cal.4th 50, 73-78 [58 Cal.Rptr.3d 608, 158 P.3d 157]
*895 46. People v. Bell (2007) 40 Cal.4th 582, 594-601 [54 Cal.Rptr.3d 453, 151 P.3d 292]
47. People v. Williams (2006) 40 Cal.4th 287, 312-313 [52 Cal.Rptr.3d 268, 148 P.3d 47]
48. People v. Lewis (2006) 39 Cal.4th 970, 1008-1024 [47 Cal.Rptr.3d 467, 140 P.3d 775]
49. People v. Stanley (2006) 39 Cal.4th 913, 934-945 [47 Cal.Rptr.3d 420, 140 P.3d 736]
50. People v. Ledesma (2006) 39 Cal.4th 641, 677-680 [47 Cal.Rptr.3d 326, 140 P.3d 657]
51. People v. Johnson (2006) 38 Cal.4th 1096, 1098-1104 [45 Cal.Rptr.3d 1, 136 P.3d 804]
52. In re Freeman (2006) 38 Cal.4th 630, 643-645 [42 Cal.Rptr.3d 850, 133 P.3d 1013]
53. People v. Avila (2006) 38 Cal.4th 491, 540-558 [43 Cal.Rptr.3d 1, 133 P.3d 1076]
54. People v. Huggins (2006) 38 Cal.4th 175, 226-236 [41 Cal.Rptr.3d 593, 131 P.3d 995]
55. People v. Jurado (2006) 38 Cal.4th 72, 102-108 [41 Cal.Rptr.3d 319, 131 P.3d 400]
56. People v. Schmeck (2005) 37 Cal.4th 240, 265-275 [33 Cal.Rptr.3d 397, 118 P.3d 451]
57. People v. Gray (2005) 37 Cal.4th 168, 183-192 [33 Cal.Rptr.3d 451, 118 P.3d 496]
58. People v. Cornwell (2005) 37 Cal.4th 50, 66-74 [33 Cal.Rptr.3d 1, 117 P.3d 622]
59. People v. Ward (2005) 36 Cal.4th 186, 199-205 [30 Cal.Rptr.3d 464, 114 P.3d 717]
60. People v. Roldan (2005) 35 Cal.4th 646, 701-703 [27 Cal.Rptr.3d 360, 110 P.3d 289]
*896 61. People v. Panah (2005) 35 Cal.4th 395, 438-442 [25 Cal.Rptr.3d 672, 107 P.3d 790]
62. People v. Smith (2005) 35 Cal.4th 334, 346-349 [25 Cal.Rptr.3d 554, 107 P.3d 229]
63. People v. Young (2005) 34 Cal.4th 1149, 1170-1174 [24 Cal.Rptr.3d 112, 105 P.3d 487]
64. People v. Morrison (2004) 34 Cal.4th 698, 709-710 [21 Cal.Rptr.3d 682, 101 P.3d 568]
65. People v. Haley (2004) 34 Cal.4th 283, 304-308 [17 Cal.Rptr.3d 877, 96 P.3d 170]
66. People v. Griffin (2004) 33 Cal.4th 536, 552-557 [15 Cal.Rptr.3d 743, 93 P.3d 344]
67. People v. Cleveland (2004) 32 Cal.4th 704, 730-734 [11 Cal.Rptr.3d 236, 86 P.3d 302]
68. People v. Heard (2003) 31 Cal.4th 946, 969-971 [4 Cal.Rptr.3d 131, 75 P.3d 53]
69. People v. Reynoso (2003) 31 Cal.4th 903, 907-929 [3 Cal.Rptr.3d 769, 74 P.3d 852]
70. People v. Yeoman (2003) 31 Cal.4th 93, 115-119 [2 Cal.Rptr.3d 186, 72 P.3d 1166]
71. People v. Johnson (2003) 30 Cal.4th 1302, 1310-1325 [1 Cal.Rptr.3d 1, 71 P.3d 270]
72. People v. Jones (2003) 30 Cal.4th 1084, 1102-1105 [135 Cal.Rptr.2d 370, 70 P.3d 359]
73. People v. Boyette (2002) 29 Cal.4th 381, 419-423 [127 Cal.Rptr.2d 544, 58 P.3d 391]
74. People v. Gutierrez (2002) 28 Cal.4th 1083, 1121-1126 [124 Cal.Rptr.2d 373, 52 P.3d 572]
75. People v. McDermott (2002) 28 Cal.4th 946, 966-981 [123 Cal.Rptr.2d 654, 51 P.3d 874]
*897 76. People v. Cash (2002) 28 Cal.4th 703, 723-726 [122 Cal.Rptr.2d 545, 50 P.3d 332]
77. People v. Farnam (2002) 28 Cal.4th 107, 134-139 [121 Cal.Rptr.2d 106, 47 P.3d 988]
78. People v. Catlin (2001) 26 Cal.4th 81, 115-119 [109 Cal.Rptr.2d 31, 26 P.3d 357]
79. People v. Anderson (2001) 25 Cal.4th 543, 568-570 [106 Cal.Rptr.2d 575, 22 P.3d 347]
80. People v. Silva (2001) 25 Cal.4th 345, 376-386 [106 Cal.Rptr.2d 93, 21 P.3d 769]
81. People v. Ayala (2000) 24 Cal.4th 243, 264-269 [99 Cal.Rptr.2d 532, 6 P.3d 193]
82. People v. Box (2000) 23 Cal.4th 1153, 1185-1192 [99 Cal.Rptr.2d 69, 5 P.3d 130]
83. People v. Jenkins (2000) 22 Cal.4th 900, 992-995 [95 Cal.Rptr.2d 377, 997 P.2d 1044]
84. People v. Ervin (2000) 22 Cal.4th 48, 74-77 [91 Cal.Rptr.2d 623, 990 P.2d 506]
85. People v. Hayes (1999) 21 Cal.4th 1211, 1283-1284 [91 Cal.Rptr.2d 211, 989 P.2d 645]
86. People v. Welch (1999) 20 Cal.4th 701, 745-746 [85 Cal.Rptr.2d 203, 976 P.2d 754]
87. People v. Bolin (1998) 18 Cal.4th 297, 316-317 [75 Cal.Rptr.2d 412, 956 P.2d 374]
88. People v. Jones (1998) 17 Cal.4th 279, 293-295 [70 Cal.Rptr.2d 793, 949 P.2d 890]
89. People v. Williams (1997) 16 Cal.4th 635, 663-668 [66 Cal.Rptr.2d 573, 941 P.2d 752]
90. People v. Jones (1997) 15 Cal.4th 119, 159-163 [61 Cal.Rptr.2d 386, 931 P.2d 960]
*898 91. People v. Mayfield (1997) 14 Cal.4th 668, 726-727 [60 Cal.Rptr.2d 1, 928 P.2d 485]
92. People v. Alvarez (1996) 14 Cal.4th 155, 192-199 [58 Cal.Rptr.2d 385, 926 P.2d 365]
93. People v. Jackson (1996) 13 Cal.4th 1164, 1195-1198 [56 Cal.Rptr.2d 49, 920 P.2d 1254]
94. People v. Arias (1996) 13 Cal.4th 92, 134-140 [51 Cal.Rptr.2d 770, 913 P.2d 980]
95. People v. Davenport (1995) 11 Cal.4th 1171, 1199-1203 [47 Cal.Rptr.2d 800, 906 P.2d 1068]
96. People v. Crittenden (1994) 9 Cal.4th 83, 114-120 [36 Cal.Rptr.2d 474, 885 P.2d 887]
97. People v. Turner (1994) 8 Cal.4th 137, 164-172 [32 Cal.Rptr.2d 762, 878 P.2d 521]
98. People v. Fudge (1994) 7 Cal.4th 1075, 1095-1098 [31 Cal.Rptr.2d 321, 875 P.2d 36]
99. People v. Montiel (1993) 5 Cal.4th 877, 907-911 [21 Cal.Rptr.2d 705, 855 P.2d 1277]
100. People v. Sims (1993) 5 Cal.4th 405, 427-432 [20 Cal.Rptr.2d 537, 853 P.2d 992]
101. People v. Garceau (1993) 6 Cal.4th 140, 170-173 [24 Cal.Rptr.2d 664, 862 P.2d 664]
102. People v. Cummings (1993) 4 Cal.4th 1233, 1281-1283 [18 Cal.Rptr.2d 796, 850 P.2d 1]